BLUE CROSS & BLUE SHIELD OF MICHIGAN v INSURANCE
COMMISSIONER

Docket No. 59320. Argued November 1, 1977 (Calendar No. 2).—
Decided October 2, 1978. Rehearing denied 405 Mich 1001.

The Insurance Commissioner denied Blue Cross and Blue Shield
of Michigan the rate increases it requested for 1975-1976,
because he found that the requests were based in part on waste
in health care costs. The Insurance Commissioner later granted
a smaller rate increase request. The corporation then brought
an action seeking declaratory relief, challenging the regulatory
powers claimed by the Insurance Commissioner with regard to
disapproving rate increases to the extent they resulted from
practices he determined to be wasteful. The Ingham Circuit
Court, Jack W. Warren, J., granted a judgment which upheld
most of the Insurance Commissioner's claims of authority. The
parties have agreed that the requested rate increases them-
selves are no longer in issue. The plaintiff appeals prior to
decision of the Court of Appeals.

After this case was submitted to the Court, the Joint Admin-
istrative Rules Committee of the Legislature approved adminis-
trative rules which affect the Insurance Commissioner's powers
and a new Public Health Code, 1978 PA 368, was enacted
which contains extensive provisions regarding hospitals and
health maintenance services which will become effective on
different future dates. These subsequent legislative actions were
not before the Court, which expressed no opinion as to their
validity or meaning. With respect to the issues presented it was
*held:*

1. The Insurance Commissioner has no inherent regulatory
authority over Blue Cross and Blue Shield of Michigan. His

REFERENCES FOR POINTS IN HEADNOTES
[1-11, 13-24] 43 Am Jur 2d, Insurance §§ 11, 55, 64.
[5] 43 Am Jur 2d, Insurance § 56.
[8, 9, 13] 43 Am Jur 2d, Insurance § 69.
[10] 22 Am Jur 2d, Declaratory Judgments § 40 *et seq.*
[12, 14-16] 73 Am Jur 2d, Statutes § 168.
[14] 73 Am Jur 2d, Statutes § 147 *et seq.*
[16] 43 Am Jur 2d, Insurance § 288.

authority comes solely from legislation, which in the instant case is the legislation and subsequent amendments enabling the incorporation of nonprofit, tax-exempt "charitable and benevolent institutions" for the purpose of providing broad health care protection for subscribers.

2. The Insurance Commissioner's statutory authority to approve the rates charged to subscribers and rates of payment to hospitals applies only to hospital services and does not state what standards are to guide the commissioner in exercising that authority. However, other sections of the legislation grant the initial authority to withhold a certificate of authority to do business if the commissioner is not satisfied that the rates to be charged are "fair and reasonable". It is logical to assume, in the absence of any different standard in the legislation, that the Legislature intended the standard of "fair and reasonable" rates to apply both before issuance of the certificate and upon the exercise of the commissioner's continuing statutory authority over rates charged to subscribers for hospital service coverage and the rates paid by the corporation to hospitals for services rendered.

3. Rates which include waste may not be "fair and reasonable" because they may retard rather than promote the availability of financial health care protection. The Legislature would not intend that health care corporations, which were designed as a solution to the problem of inadequate health care, should be free to be a contributing cause of the problem. There are three qualifications to this conclusion. First, the Insurance Commissioner cannot disapprove a rate increase request on the basis of expenditures which the corporation can affect only by invading the physician-patient relationship, usurping the physician's control over the practice of medicine, or by limiting the subscriber's free choice of hospitals and doctors. Second, the Insurance Commissioner only has the authority to *consider* waste in determining if a rate increase is fair and reasonable. No section of the legislation indicates that the Insurance Commissioner has the additional authority to prescribe the specific remedy to reduce or eliminate the waste. His only powers are *to approve or disapprove rates as a whole or in part.* The management of the corporation has been specifically entrusted to the board of directors, not to the commissioner. Third, the Insurance Commissioner must exercise his authority reasonably and cannot issue orders and opinions which conflict with more specific grants of authority by the Legislature to other state agencies, such as the Department of Public Health. The

commissioner's actions are subject to judicial review and the record must support any findings of fact and conclusions of law.

4. The Insurance Commissioner's initial authority over the corporation's reserves is limited to assuring that adequate and reasonable reserves to insure the maturity of the corporation's contracts are provided. It is logical to assume, in the absence of any legislative provision to the contrary, that the commissioner's continuing authority over reserves must be similarly limited. There is no specific statutory authority of the commissioner to approve rates of payment to physicians through regulation of the reserves or otherwise. Therefore, the commissioner's continuing statutory authority over the corporation's financial reserves does not include the power to disapprove directly or indirectly an increase in the rates of payment to physicians. His only power with respect to reserves is to determine actuarially and require the corporation to maintain reserves in an amount sufficient to assure the maturity of its contracts.

5. Advertising expenses fall within the context of "acquisition and administrative expenses" and necessarily play a part in the rates charged to subscribers by the corporation. The Insurance Commissioner thus can properly consider the total dollar amount budgeted for hospital service advertising in determining whether to approve a rate increase request for hospital services. However, he does not have the power to consider the *content* of the corporation's hospital service advertising.

6. The question of benefits was not raised by the parties and is not a matter in controversy. The circuit court was in error to have decided the matter in its opinion and therefore that part of the judgment which concerns benefits is void.

Reversed in part, affirmed in part.

Justice Williams concurred in part:

1. He agreed that the Commissioner of Insurance has authority to review subscriber rates and may properly do so under a "fair and reasonable" standard; he also agreed that the commissioner· cannot disapprove a rate increase on the basis of expenditures which the corporation can affect only by invading the physician-patient relationship, usurping the physician's control over the practice of medicine, or limiting the subscriber's free choice of hospitals and doctors, and that the commissioner must exercise his authority reasonably, with his actions subject to judicial review.

2. However, he did not agree that the commissioner may only *consider* waste in determining if a rate increase is fair and

reasonable without prescribing specific remedies to reduce or eliminate waste. The specific means to reduce the waste is not within the sole control of the corporation's management, but can properly come within the purview of rate regulation; exclusion of wasteful expenses from the rate base is warranted under the broad rate review authority conferred on the commissioner by statute. This view is supported by administrative rules recently approved by the Legislature's Joint Administrative Rules Committee. The Court may properly take judicial notice of such legislatively approved administrative rules as an expression by the enacting body of its intent in enacting the underlying legislation, but in the instant case may choose not to grant the usual deference to these pronouncements because they were made after this case was argued and the parties have not had an opportunity to brief and argue them.

3. Advertising falls within "acquisition and administrative expenses", which are subject at all times to approval by the commissioner. It is only through examination of the content of advertising and exclusion from the rate base of advertising expenses not appropriate to the central purpose of the corporation that the Insurance Commissioner can realistically determine the reasonableness or wastefulness of the expense.

4. The Insurance Commissioner has determined that the plaintiff corporation is carrying forth its programs in a wasteful manner that may eventually increase expenses and therefore rates to the point where medical care is unavailable. The commissioner has, in the main, acted properly and within his regulatory authority.

Justice Levin, joined by Chief Justice Kavanagh, would hold that the Insurance Commissioner was without power to disapprove the rate increases on the grounds advanced by him and reverse. Justice Levin wrote:

1. The only issue is whether the commissioner is empowered to disapprove rate increases on the grounds he advanced in entering the orders which precipitated the litigation. The Court holds that he is not, and Justice Levin and the Chief Justice agree. The dictum that in setting rates the commissioner may "consider" whether there has been waste, that rates may be disapproved because of waste, is unrelated to the facts of this case; it is precipitous to begin the attempt to define the commissioner's powers in a factual vacuum. Absent a rate disapproval predicated on identified "waste" and a supporting factual record, the Court's declaration that waste may be considered and, on that account, rates disapproved, circumscribed by stated limitations regarding physician and patient

choice, under a standard of "fair and reasonable" without indication of whose judgment of what is fair and reasonable will govern, is so indefinite that there is a substantial risk that the Court's declaration may foster unrealizable expectations regarding the scope of the commissioner's powers.

2. The Commissioner of Insurance asserts a power to control or supervise the health care system, through Blue Cross and Blue Shield of Michigan, to promote efficiency and reduce costs. Whether such power should be conferred on any public official, and, if so, on whom and how, is still a lively issue awaiting legislative resolution. The structure and history of the enabling acts are persuasive that such power was not conferred on the commissioner in 1939, almost 40 years ago. The commissioner's argument that there is a real and urgent need for responsible and effective governmental control of Blue Cross and Blue Shield is strong and appealing, but the enabling acts cannot, on that account, be read to provide it.

3. Even if Blue Cross and Blue Shield of Michigan either has achieved or soon will achieve so dominant a position that the courts should recognize, by the application of common-law principles and concepts, that it has legally enforceable duties (e.g., to contain costs and to be cost-effective and efficient, avoiding "waste") to those affected by its policies not stated in the enabling acts or in its contracts, such common-law duties would be enforceable in a court of law, not administratively. Assuming that the commissioner would have the right to maintain an action to enforce compliance with such common-law duties, the enabling acts do not confer upon him the power to enforce administratively duties owing to health-care providers or users that may be recognized by the common law.

4. The argument for control of rates charged subscribers and rates of payment to physicians based on the commissioner's power to determine the level of reserves is not persuasive. The purpose of reserves is to assure liquidity and solvency. It distorts that purpose to employ the power over reserves as the mechanism for control or supervision of programs or operations or to achieve some purpose, however meritorious, unrelated to the need to maintain adequate funds to assure discharge of obligations to subscribers and health care providers.

5. The commissioner must consider the fairness and reasonableness of rates and benefits in deciding whether chartering a proposed health care corporation would work a fraud on the public, but he does not have continuing authority under the chartering provisions to decide whether rates and benefits are fair and reasonable and to require adjustments. His only rem-

edy against a chartered health care corporation is to revoke its charter upon a finding of fraud. Assuming that a "fair and reasonable" standard were to be read into the rate approval provisions of the hospital care enabling act, the commissioner's judgment of what is fair and reasonable could not govern, for if it did, given the limited judicial review of administrative determinations, the commissioner might substitute a low "fair and reasonable" standard of health care to achieve economy and efficiency, a result not consonant with the structure and history of the health care enabling acts.

6. The health care enabling acts were intended to resolve legal challenges that prepaid health care corporations engage in the illegal practice of medicine and are subject to regulation as insurance companies, and powers were conferred on the Insurance Commissioner to protect the public against fraud and to preserve solvency. But hospitals were left to decide the facilities and services to be provided, doctors to decide the hospitals with which to affiliate, and patients to choose a doctor and, within the limitations of the doctor's affiliations, a hospital. Blue Cross and Blue Shield of Michigan is a voluntary association of health care providers and users who may develop such health care programs as they can agree upon within the framework of the enabling acts, and, together with hospitals and doctors, it decides the level, quality, and efficiency of health care, including bedding and utilization practices.

7. The commissioner's power to approve rates and acquisition and administrative expenses was conferred in the context of a health care system designed and administered by the private sector. There was no purpose in the enabling acts to authorize the commissioner to alter the design or assume a role in the administration of the system. Implicit in the commissioner's directives to Blue Cross and Blue Shield of Michigan is the concept that it should use its institutional and fiscal power to revise the health care system to achieve greater cost containment without regard to whether the providers agree to the revisions. The enabling acts, the source of the commissioner's authority, do not address the consequences of a health care corporation achieving dominance of the health care system, a development not in legislative contemplation when they were enacted; the premise that program levels may be imposed on providers and users ignores the voluntary nature of the association and compact, and is inconsistent with the structure and history of the enabling acts. A fundamental premise of the Blue Cross-Blue Shield concept was that the cost of providing health care to a subscriber would be prepaid in full by rates charged

subscribers. To the extent that implementation of the commissioner's directives results in transferring costs other than to subscribers, that concept will be eroded.

8. The commissioner does not have statutory authority to require changes in the agreed-upon programs, whether to improve quality or efficiency or to reduce cost. He may not inhibit by rate disapproval the provision of facilities and services which, in the judgment of informed and qualified health care professionals, are necessary and warranted. Similarly, expenditures for advertising related to the business and purposes of Blue Cross and Blue Shield cannot be disallowed; the judgment of its managers regarding the nature and extent of such expenditures, if related to its business and purposes, is not subject to review by the commissioner.

9. There is widespread concern about the rapidly rising cost of health care. Health care providers and, indeed, Blue Cross and Blue Shield itself have imposed guidelines and restrictions to improve quality and efficiency and to reduce costs, but these measures, while limiting both the doctor's and the patient's freedom of choice and judgment, are not governmental decisions; it is quite another matter to involve government in such decisions. The question whether and to what extent government should supervise or control health care corporations, health insurance companies, and the health care industry is a matter of national and statewide debate. Whatever the outcome of that debate, it is clear that the basic issues of public policy, still unresolved, were not decided in 1939, almost 40 years ago, in favor of governmental control or supervision.

OPINION OF THE COURT

1. INSURANCE — HEALTH CARE SERVICES — REGULATION.

　　The Insurance Commissioner's authority to regulate nonprofit group health care plans comes solely from the Legislature, through the enabling legislation which created the corporations providing health care services and subsequent amendments (MCL 550.301 *et seq.*, 550.501 *et seq.*; MSA 24.591 *et seq.*, 24.621 *et seq.*).

2. INSURANCE — HEALTH CARE SERVICES — HOSPITALS — REGULATION.

　　The standard that is to guide the Insurance Commissioner in regulating rates for hospital services provided by a nonprofit group health care plan is whether the rates are "fair and reasonable"; this includes the authority to consider the content of a request for a rate increase and to disapprove it as a whole or in part if it includes waste (MCL 550.503; MSA 24.623).

3. INSURANCE — HEALTH CARE SERVICES — HOSPITALS — REGULATION.

Rates for hosptial services provided by a nonprofit group health care plan which include waste may not be "fair and reasonable" because they may retard rather than promote the availability of financial health care protection; the Legislature did not intend that such health care corporations, which were designed as a solution to the problem of inadequate health care, should be free to be a contributing cause of the problem (MCL 550.503; MSA 24.623).

4. INSURANCE — HEALTH CARE SERVICES — HOSPITALS — RATES — REGULATION.

The authority of the Insurance Commissioner to regulate rates for hospital services provided by a nonprofit group health care plan by a "fair and reasonable" standard is limited by the caveats that the corporation cannot be required to take any action that would invade the physician-patient relationship, usurp the physician's control over the practice of medicine, or limit the subscriber's free choice of hospitals and doctors; that the commissioner does not have the additional authority to prescribe the specific remedy which the corporation must use to reduce or eliminate the waste; and that the commissioner must exercise his regulating authority reasonably, his orders cannot conflict with more specific grants of authority by the Legislature to other state agencies, such as the Department of Public Health (MCL 550.503; MSA 24.623).

5. INSURANCE — HEALTH CARE SERVICES — HOSPITALS — RATES — REGULATION.

Disapproval of a nonprofit group health care plan's requested rate increase for hospital services by the Insurance Commissioner on a finding that it contains wasteful expenditures is subject to judicial review; the record must support any findings of fact and conclusions of law (MCL 550.503; MSA 24.623).

6. INSURANCE — HEALTH CARE SERVICES — CORPORATE RESERVES — PAYMENTS TO PHYSICIANS — REGULATION.

The Insurance Commissioner is authorized to determine actuarially the level of reserves of a nonprofit corporation providing group health care services necessary to insure that the corporation could fulfill the commitments which it had made and to set the reserves at that level; however, this does not indirectly grant the Insurance Commissioner the authority to regulate increases in the rates of payment by the corporation to physicians (MCL 550.311; MSA 24.601).

7. INSURANCE — HEALTH CARE SERVICES — REGULATION.

The Insurance Commissioner does not have the statutory authority to approve rates of payment to physicians by a nonprofit corporation providing group health care services (MCL 550.503; MSA 24.623).

8. INSURANCE — HEALTH CARE SERVICES — ACQUISITION EXPENSES — ADVERTISING — REGULATION — WORDS AND PHRASES.

Advertising expenses fall within the context of "acquisition and administrative expenses" of a nonprofit corporation providing group health care services and necessarily play a part in the rates charged to subscribers by the corporation; the Insurance Commissioner, therefore, can properly consider the total dollar amount budgeted for hospital service advertising in determining whether to approve a rate increase request for hospital services (MCL 550.512; MSA 24.632).

9. INSURANCE — HEALTH CARE SERVICES — ADVERTISING — REGULATION.

The Insurance Commissioner has no control over the content of advertising by a nonprofit corporation providing group health care services (MCL 550.301 *et seq.,* 550.501 *et seq.;* MSA 24.591 *et seq.,* 24.621 *et seq.).*

10. DECLARATORY JUDGMENT — ADMINISTRATIVE LAW — *SUA SPONTE* OPINION — ISSUES NOT RAISED.

It was error for a circuit court, *sua sponte* and without benefit of a record, to include in its declaratory judgment on the authority of the Insurance Commissioner over a nonprofit corporation providing group health care services a reference to the Insurance Commissioner's authority over benefits provided by the corporation where the subject of benefits never was raised by the parties in the circuit court.

OPINION CONCURRING IN PART BY WILLIAMS, J.

See headnotes 2, 5, and 8.

11. INSURANCE — HEALTH CARE SERVICES — HOSPITALS — RATES — REGULATION.

*The Insurance Commissioner not only has the authority to consider waste in determining whether rates for hospital services provided by a nonprofit group health care plan are "fair and reasonable" but also has statutory authority to prescribe the specific remedy which the corporation must use to reduce or eliminate the waste (MCL 550.503; MSA 24.623).*

12. STATUTES — LEGISLATIVE INTENT — ADMINISTRATIVE RULES —
    JUDICIAL NOTICE.

*Courts may take judicial notice of administrative rules approved
by the Legislature's Joint Administrative Rules Committee as
an expression of the Legislature's intent in enacting the under-
lying legislation.*

13. INSURANCE — HEALTH CARE SERVICES — ADVERTISING — REGULA-
    TION.

*The Insurance Commissioner has the power to examine the
content of advertising by a nonprofit corporation providing
group health care services and to exclude from the rates
charged to subscribers advertising expenses not appropriate to
the central purpose of the corporation or expenses for advertis-
ing which provide no commensurate benefit to the subscribers
(MCL 550.305, 550.512; MSA 24.595, 24.632).*

OPINION FOR REVERSAL BY LEVIN, J.

14. INSURANCE — HEALTH CARE SERVICES — REGULATION — STAT-
    UTES.

*The argument that there is a real and urgent need for responsi-
ble and effective governmental control of nonprofit corporations
providing group health care services is strong and appealing,
but the enabling acts for those corporations cannot, on that
account, be read to provide it (MCL 550.301 et seq., 550.501 et
seq.; MSA 24.591 et seq., 24.621 et seq.).*

15. INSURANCE — HEALTH CARE SERVICES — REGULATION — STAT-
    UTES.

*Whether a power to control or supervise the health care system,
through nonprofit corporations providing group health care
services, to promote efficiency and reduce costs should be
conferred on any public official and, if so, on whom and how, is
still a lively issue awaiting legislative resolution (1978 PA 368;
MCL 550.301 et seq., 550.501 et seq.; MSA 24.591 et seq., 24.621
et seq.).*

16. INSURANCE — HEALTH CARE SERVICES — COMMON-LAW DUTIES —
    ADMINISTRATIVE LAW.

*If a nonprofit corporation providing group health care services
owes to those affected by its policies common-law duties not
stated in the enabling acts or in its contracts which a court
might recognize by application of common-law principles and
concepts because the corporation is found to have achieved so
dominant a position in the health care field, those duties would*

*be enforceable in a court of law, not administratively; assuming that the Insurance Commissioner would have the right to maintain an action to enforce compliance with such common-law duties, the enabling acts do not confer upon him the power to enforce administratively duties that may be recognized by the common law owing to health-care providers or users (MCL 550.301 et seq., 550.501 et seq.; MSA 24.591 et seq., 24.621 et seq.).*

17. INSURANCE — HEALTH CARE SERVICES — CORPORATE RESERVES — REGULATION.

*The purpose of requiring reserves for a nonprofit corporation providing group health care services is to assure the corporation's liquidity and solvency; it would distort that purpose to employ the power to establish the amount of reserves as the mechanism for control or supervision of programs or operations or to achieve some purpose, however meritorious, unrelated to the need to maintain adequate funds to assure that the corporation can discharge obligations incurred to subscribers and health care providers (MCL 550.311, 550.509; MSA 24.601, 24.629).*

18. INSURANCE — HEALTH CARE SERVICES — REGULATION — RATES — BENEFITS.

*The Insurance Commissioner must consider the fairness and reasonableness of rates and benefits in deciding whether chartering a proposed nonprofit group health care corporation would work a fraud on the public; he should possibly consider the same criteria in deciding whether fraud is being practiced by a chartered corporation requiring revocation of its charter (MCL 550.305, 550.506; MSA 24.595, 24.626).*

19. INSURANCE — HEALTH CARE SERVICES — REGULATION — RATES — BENEFITS.

*The Insurance Commissioner does not have the continuing authority under chartering provisions for nonprofit corporations providing group health care services to decide whether rates and benefits are fair and reasonable and to require adjustments; his only remedy against a chartered health care corporation is to revoke its charter upon a finding of fraud (MCL 550.305, 550.506; MSA 24.595, 24.626).*

20. INSURANCE — HEALTH CARE SERVICES — REGULATION — RATES.

*The Insurance Commissioner's judgment of what is "fair and reasonable", assuming that that standard were to be read into the rate approval provisions of the group hospital care enabling*

act, could not govern, for if it did, given the limited judicial review of administrative determinations, the commissioner might substitute a low "fair and reasonable" standard of health care for economy and efficiency, a result not consonant with the structure and history of the health care enabling acts (MCL 550.301 et seq.; MSA 24.591 et seq.).

21. INSURANCE — HEALTH CARE SERVICES — REGULATION.

The group health care corporation enabling acts were intended to resolve legal challenges that prepaid health care corporations engage in the illegal practice of medicine and are subject to regulation as insurance companies, and powers were conferred by them on the Insurance Commissioner to protect the public against fraud and to preserve solvency; the health care corporation is a voluntary association of health care providers and users who may develop such health care programs as they can agree upon within the framework of the enabling acts, and, together with hospitals and doctors, it decides the level, quality, and efficiency of health care, including bedding and utilization practices (MCL 550.301 et seq., 550.501 et seq.; MSA 24.591 et seq., 24.621 et seq.).

22. INSURANCE — HEALTH CARE SERVICES — RATES — ADMINISTRATIVE EXPENSES — REGULATION.

The Insurance Commissioner's power to approve rates and acquisition and administrative expenses of nonprofit corporations providing group health care services was conferred in the context of a health care system designed and administered by the private sector; there was no purpose in the enabling acts to authorize the commissioner to alter the design or assume a role in the administration of the system (MCL 550.301 et seq., 550.501 et seq.; MSA 24.591 et seq., 24.621 et seq.).

23. INSURANCE — HEALTH CARE SERVICES — REGULATION.

The group health care plan enabling acts, the source of the Insurance Commissioner's authority over those plans, do not address the consequences of a health care corporation achieving dominance of the health care system, a development not in legislative contemplation when they were enacted; the premise that health care program levels may be imposed on providers and users ignores the voluntary nature of the association and compact, and is inconsistent with the structure and history of the enabling acts (MCL 550.301 et seq., 550.501 et seq.; MSA 24.591 et seq., 24.621 et seq.).

24. INSURANCE — HEALTH CARE SERVICES — REGULATION — RATES —
ADMINISTRATIVE EXPENSES.

*The scope of the authority delegated to the Insurance Commissioner by the Legislature does not include overseeing the efficiency of the health care system and cost containment; he may not disapprove rates charged subscribers of nonprofit group health care plans or rates of payment to hospitals because of failure by the plans to develop and implement cost containment programs or because of advertising expenditures related to the business and purposes of the plans, nor may he disallow an increase in physicians' fees (MCL 550.301 et seq., 550.501 et seq.; MSA 24.591 et seq., 24.621 et seq.).*

*Foster, Swift, Collins & Coey, P.C.* (by *Theodore W. Swift* and *David Vander Haagen),* for plaintiff.

*Frank J. Kelley,* Attorney General, *Robert A. Derengoski,* Solicitor General, and *Harry G. Iwasko, Jr.,* Assistant Attorney General, for defendant.

Amici Curiae:

*Keith B. Carlson* for The Bendix Corporation.

*George Heitler,* General Counsel, for Blue Cross Association.

*James R. Jackson* for Ford Motor Company.

*Clark, Klein, Winter, Parsons & Prewitt* (by *H. William Butler* and *L. A. Hynds)* for Michigan Association of Osteopathic Physicians and Surgeons.

*Honigman, Miller, Schwartz & Cohn* (by *Avern Cohn* and *Stephen Wasinger)* for Michigan Hospital Association.

*Miller, Klimist, Cohen, Martens & Sugerman, P.C.* (by *Bruce A. Miller* and *Duane F. Ice),* for

Michigan State AFL-CIO and Metropolitan Detroit AFL-CIO Council.

*Kerr, Wattles & Russell* (by *A. Stewart Kerr, William A. Sankbeil,* and *John L. Shoemaker)* for Michigan State Medical Society.

*Howard Hassard,* General Counsel, *Marvin C. Reiter,* and *Butzel, Levin, Winston & Quint* for National Association of Blue Shield Plans.

*John A. Fillion, Jordan Rossen,* and *Edwin G. Fabré* for UAW, International Union.

COLEMAN, J. Blue Cross and Blue Shield of Michigan (BCBSM) is seeking a declaratory judgment defining the nature and extent of the State Insurance Commissioner's (Commissioner) regulatory powers over BCBSM as set forth by the Legislature in Public Acts 108 and 109 of 1939.[1] No other relief has been requested.

After this case was briefed and argued, the Legislature's Joint Administrative Rules Committee approved rules which affect the Commissioner's powers.[2] In addition, the new Public Health Code[3] was enacted by the Legislature and, on July 25, 1978, signed by the Governor (some months after our opinion in this case initially was submitted). It contains, *inter alia,* extensive provisions regarding hospitals and health maintenance services effective on different future dates. We express no opinion as to the validity or meaning of these subsequent legislative actions. They are not before us.

---

[1] MCL 550.301 *et seq.;* MSA 24.591 *et seq.* and MCL 550.501 *et seq.;* MSA 24.621 *et seq.*

[2] 1978 AACS R 550.1 *et seq.* (January, 1978).

[3] 1978 PA 368.

The circuit court upheld virtually all of the Commissioner's claims of authority. We affirm in part and reverse in part. With respect to the issues presented, we hold:

1. The Commissioner's continuing statutory authority over the rates charged to subscribers by BCBSM for hospital service coverage and the rates paid by BCBSM to hospitals for services rendered includes the power to disapprove a rate increase request to the extent that wasteful expenditures included in the rate base are found to be not "fair and reasonable", but does not include the power to order BCBSM to implement specific cost containment programs. Management of BCBSM has been entrusted to its board of directors.

2. The Commissioner's continuing statutory authority over BCBSM's financial reserves does not include the power to disapprove directly or indirectly an increase in the rates of payment to physicians. The Commissioner's only power with respect to reserves is to determine actuarially and require BCBSM to maintain reserves in an amount sufficient to assure the maturity of BCBSM's contracts.

3. The Commissioner may consider the dollar amount budgeted for advertising in so far as it affects his statutory authority to approve subscriber rates for hospital services. He does not have the power to consider the content of BCBSM's hospital service advertising.

4. The question of benefits was not raised by the parties and is not a matter in controversy. The circuit court was in error to have encompassed the matter in its opinion and we therefore hold that part of the judgment which concerns benefits to be void.

I

The factual background of the case is pertinent only so far as it reveals the areas of disputed authority.

In 1975 BCBSM requested a subscriber fee rate increase of 33% totaling approximately 335 million dollars for the year. After the appointment of a master and extensive hearings, the Commissioner issued an order denying the rate increase. Accompanying that order was a voluminous opinion detailing the reasons why he was disapproving the increase. Important to the instant case are the portions of the opinion relating to overbedding, overutilization, physician screens (rates of payment to physicians)[4] and advertising.

The Commissioner's opinion addressed in detail the problem of overbedding and on the basis of several major studies (including one by the Department of Public Health) concluded that more than 23 million dollars of BCBSM's requested rate increase would be paid to hospitals for the subsidization of excess beds. The opinion similarly addressed the problem of overutilization and concluded that an additional 23 million dollars of the requested rate increase would be spent on unnecessary health care. The opinion briefly discussed proposed increases in the physician screens and concluded that such increases were not justified. The opinion then examined the content of BCBSM's advertising and concluded that nearly 700 thousand dollars of it was wasteful.

[4] Physician screens is a term used by BCBSM to describe the monetary level at which BCBSM will pay physicians for given health care services. The screens are determined on a geographic basis. Studies are made of the fees charged by the physicians in a given area for the services. The screen for those services in that area is then set at a certain percentile of the fees charged by the physicians. The screen represents the maximum amount BCBSM will pay for the services in that geographic area.

Shortly after the Commissioner issued his opinion, BCBSM submitted a revised subscriber fee rate increase request that did not include the amounts determined by the Commissioner to be wasteful. The Commissioner approved this request in full. The amount of the increase was approximately 16%, totaling 163 million dollars for the year.

In June of 1975, BCBSM filed a complaint for declaratory judgment in circuit court challenging the nature and extent of the Commissioner's regulatory power. The circuit court upheld the Commissioner's authority with respect to virtually all of the actions he had taken during the 1975 rate review proceedings. The only area in which the court did not agree with the Commissioner concerned a contention that the Commissioner had the authority to require BCBSM to submit its proposed advertising in advance of publication to the Commissioner for approval. The court found no authority in the enabling legislation to support such a contention.

Subsequently, the petition for review of the rate increase originally filed by BCBSM in the circuit court was dismissed by stipulation of the parties. The only relief requested on appeal was by-pass to this Court and a review of the declaratory judgment defining the Commissioner's powers. By-pass was granted. As a result, we are here engaged only in the task of determining whether the Commissioner had the authority to act, not whether he exercised authority reasonably during the 1975 rate review proceedings.

II

BCBSM is a unique creation. It is a non-profit,

tax-exempt "charitable and benevolent institution",[5] incorporated pursuant to special enabling legislation enacted by the Michigan Legislature in 1939,[6] for the purpose of providing a mechanism for broad health care protection to the people of the State of Michigan.

BCBSM acts as an intermediary between its members, commonly known as the subscribers, and the hospitals and physicians who provide health care services, commonly known as the providers.

Most subscribers belong to groups such as labor unions, fraternal organizations, or governmental or professional associations. These groups independently determine what health care services they wish to secure for their members and then enter into individual contracts with BCBSM. Generally, the contracts provide that the subscribers will each pay a periodic subscription fee to BCBSM and BCBSM in return will arrange for the provision of the desired services. The subscribers pay the subscription fee regardless of whether they actually utilize the services. Thus, the cost of the services to any individual subscriber who does utilize them is shared by the entire group to which that subscriber belongs. In many cases, the subscription fee is paid by the subscriber's employer. Often, such arrangements are the result of hard-fought collective bargaining agreements.

After the subscriber contracts have been negotiated, BCBSM enters into separate contracts with providers. The providers agree to furnish the desired services in return for a set fee to be paid by BCBSM. The providers who enter into such contracts are known as participating providers, while

---

[5] MCL 550.315; MSA 24.605 and MCL 550.515; MSA 24.635.

[6] 1939 PA 108, 109.

those who do not are known as non-participating providers.

If a subscriber obtains covered health care services from a participating provider, the subscriber pays no charge. The participating provider accepts the set fee from BCBSM as payment in full. If, however, the subscriber obtains covered services from a non-participating provider, the subscriber pays that provider whatever fee the provider charges for the services. Then, BCBSM reimburses the subscriber, but only up to the amount that would be paid to a participating provider for the same services.

BCBSM has a direct and distinct contractual relationship both with its subscribers and with the participating providers. Other entities in the health care protection field, most notably health insurance companies, do not enjoy such a position. They have a contractual relationship only with their policyholders. Unlike BCBSM, they do not have direct access to both sides of the health care equation.[7]

In the past BCBSM has acted not merely as a passive conduit in its role as an intermediary between the subscribers and the providers. For example, it has required participating hospitals to comply with certain "participation qualifications", including such requirements as the maintenance of effective cost accounting systems and committees to review hospital utilization policies. Some of these requirements were instituted at the request or direction of the Commissioner.[8]

---

[7] See *Michigan Governor's Study Commission on Prepaid Hospital and Medical Care* (1962), pp 29-30.

[8] See *Nankin Hospital v Michigan Hospital Service [Blue Cross]*, 361 F Supp 1199, 1203-1204 (ED Mich, 1973), especially footnote 9 and the corresponding text and MCL 550.503; MSA 24.623 as amended, which states that the "corporation shall not deny the subscribers the right

BCBSM is not an insurance company in the usual sense of the term.[9] It is a statutory, non-profit corporation which is regulated within the limits of special enabling legislation by the Commissioner "in order to protect the interests of subscribers".[10] Although it does operate according to principles similar to those of insurance companies, "it is not carried on as an insurance business for profit * * *, but rather it provides a method for promoting the public health and welfare in assisting * * * persons to budget" health care costs.[11]

Although BCBSM is regulated by the Commissioner, it is not managed by the Commissioner. It has its own officers and a board of directors to which management of the corporation is statutorily entrusted.[12] Originally, the membership of the board was dominated by physicians and other persons closely associated with the medical profession. The subscribers had only a few outnumbered representatives. Over the years, however, the composition of the board has gradually changed. Today, 27 of the board's 48 directors are subscriber representatives.

BCBSM is the largest single health care protection entity of any kind in the State of Michigan.

---

to select any hospital which is licensed by the state department of public health *and which meets the standards set by the corporation for all contracting hospitals*". (Emphasis added.) The quoted language replaced previous language that prohibited the corporation from denying a hospital a participation contract on the basis of "a lack of community need" regarding hospital beds.

[9] See *Michigan Hospital Service [Blue Cross] v Sharpe,* 339 Mich 357; 63 NW2d 638 (1954).

[10] See Burns (Executive Secretary, Michigan State Medical Society), *The Michigan Enabling Act for Non-Profit Medical Care Plans,* 6 Law and Contemporary Problems 559, 560 (1939).

[11] Panchuk (Assistant Attorney General), *Hospital and Medical Service Plans,* 19 Michigan State B J 570, 572 (1940).

[12] MCL 550.502; MSA 24.622.

Out of a total state population of approximately nine million people, almost five and one-half million or roughly 60% are BCBSM subscribers. There are, however, wide variations in the percentage of subscribers from county to county and from region to region. On a county basis, the percentages range anywhere from a low of approximately 16% in Cass County to a high of approximately 78% in Oakland County. Regionally, nearly 70% of the people in the southeastern portion of the Lower Peninsula are BCBSM subscribers. However, the figures drop drastically to approximately 40% for the remainder of the Lower Peninsula and still further, to approximately 25%, for the Upper Peninsula.[13] In terms of provider participation, BCBSM has contracts with approximately 95% of all the hospitals in the state and 65% of all the physicians.[14] Although we have not been provided with exact figures for the county and regional variations in provider participation, we assume that some variations do exist.

## III

Although Michigan's health care enabling legislation has been amended through the years since its enactment in 1939, its prior history is enlightening to any analysis.

By the 1920's it was becoming apparent that there was a serious nationwide problem in the distribution of medical care. Many people who needed it were not receiving it. The poverty of the Great Depression intensified this problem. According to one article, "a vast number of the popula-

---

[13] These figures are from Michigan Hospital Association's brief amicus curiae, appendix D, pp 56-59.

[14] These figures are from BCBSM's brief, p 1.

tion must go without needed medical attention".[15]
A medical survey of 19,000 families cited in this
article indicated that only 58% of the people who
needed medical care were receiving it. Another
article cited several other major medical studies
and concluded that "the great majority of our
citizens receive inadequate medical service".[16]

The high relative cost of medical care was one
cause of this distressing situation. Another equally
important cause was the irregular manner in
which disease and injury strike and the wide
variations in the services and the costs involved.
As one commentator said:

"The costs of illness or medical need are highly
variable in their impacts upon family budgets and
security. Small costs for medical care may be absorbed
in a family budget which is above the bare subsistence
level; but the occurrence of a 'high cost' illness, even
when moderate fees are charged for each unit of ser-
vice, may be a financial catastrophe for a family of
small, modest or even substantial means.

"Illness and disability are not considerate of the
family exchequer, and large costs may fall upon small
purses. The plain fact, well attested by numerous stud-
ies, is that families cannot, even if they would, budget
against expenditures which fluctuate within such broad
ranges that they may exceed even annual income, and
at the same time destroy earning power."[17]

The business sector had not moved to rectify the
problem of bringing together the people in need of
health care and those who could provide it. Health
insurance policies were usually too expensive and

[15] Comment, *Insurance: Medical Service Policies: Contract by Corpo-
ration to Render Medical Services*, 25 Cal L Rev 91, 93 (1936).

[16] Note, *The Legal Problems of Group Health*, 52 Harvard L Rev
809-810 (1939).

[17] Falk, *An Introduction to National Problems in Medical Care*, 6
Law and Contemporary Problems 497, 503 (1939).

too inefficient to be of widespread use.[18] As a result, there was an urgent need for some mechanism that would assure the availability of adequate medical care for the many people who needed it.

A small but vociferous movement across the country advocated the establishment of government controlled socialized medicine as a solution to this problem. The medical and health care professions on the other hand were fiercely opposed to this idea.

Between the extremes, various private organizations around the country began to experiment with different plans for providing the needed health care services. One of the most successful was the group health service benefit plan under which subscribers each paid a relatively small periodic fee to the entity administering the plan; the entity then negotiated contracts with physicians and hospitals; and, when needed, the subscribers received specified medical services in return.[19] Because the cost of the services was shared by the group, the subscription rates were low enough that many people could afford them. The legal status of these plans was likened to that of a consumer cooperative.[20]

Despite the initial success of these plans, some serious obstacles soon threatened their continued existence. They were accused of operating as insurance companies without having complied with state insurance regulations. Some courts dismissed these accusations because the plans were providing services instead of cash, but other courts did not.

---

[18] *Legal Problems of Group Health, supra,* 810.

[19] Brown, *American Experimentation in Meeting Medical Needs by Voluntary Action,* 6 Law and Contemporary Problems 507 (1939).

[20] Panchuk, *Hospital and Medical Service Plans, supra,* 573.

There also were accusations of engaging in the practice of medicine without a license. Some courts were less dogmatic than others, drawing a distinction between the actual practice of medicine—the diagnosis and treatment of injury and disease—and the negotiation of contracts for the provision of medical care. However, enough courts prohibited the plans from continuing their operations to make the future of the plans uncertain.[21]

In addition to these obstacles, some of the organizations experimenting with the plans were more interested in profits than in providing adequate medical care.

These facts led to the conclusion that comprehensive legislation was necessary. As one commentator said:

"The final answer, however, must lie in special legislation. Assuming the most favorable judicial action, it is clear that the present uncertain state of the law permits attacks on groups already organized and deters the formation of new ones. Moreover, the field is certainly not one which should be left entirely unregulated; the very attractiveness of the plans offers peculiar opportunities for unscrupulous commerical activity. *And the cooperatives themselves, as they become larger, must inevitably tend to become impersonal, with practical control concentrated in the hands of salaried directors and officers.*" (Emphasis added.)[22]

The Michigan enabling legislation sought to legitimatize the prepaid group health benefit plans. The ultimate purpose of the legislation was to enable the people in need of health care protection to become members of a group plan so that adequate hospital and medical care would be within

---

[21] *Legal Problems of Group Health, supra,* 811-816
[22] *Id.,* 816.

the financial grasp of as many people as possible.
As stated in the first section of the legislation,
MCL 550.301; MSA 24.591, "[i]t is the purpose and
intent of this act, and the policy of the legislature,
*to promote a wider distribution of medical care
* * *"*. (Emphasis added.)

In an effort to keep the rates charged to the
subscribers of the plans as low as possible, the
Legislature decreed that the plans must operate
on a nonprofit basis.[23] To reduce further the plans'
operating expenses, the Legislature decreed that
the plans would be tax-exempt.[24] The Legislature
even included sections in the enabling legislation
which authorized the corporations administering
the plans to accept charitable contributions to pay
the subscription rates of persons who could not
afford to pay the rates themselves.[25]

## IV

Prior to 1975, BCBSM consisted of two separate
but similar corporations—Blue Cross of Michigan
and Blue Shield of Michigan. Blue Cross was con-
cerned primarily with the provision of hospital
services, while Blue Shield was concerned with the
provision of physician's services and related medi-
cal care. The two corporations were incorporated
and regulated pursuant to similar but distinctive
enabling legislation.[26] In 1974, the Legislature
added sections to the original enabling legislation
which authorized the two corporations to merge.[27]
These new sections provided that the "consolidated
corporation" was "to be subject to regulation by

[23] MCL 550.302; MSA 24.592 and MCL 550.501; MSA 24.621.
[24] MCL 550.315; MSA 24.605 and MCL 550.515; MSA 24.635.
[25] MCL 550.313; MSA 24.603 and MCL 550.510; MSA 24.630.
[26] See fn 1 *supra.*
[27] MCL 550.309a; MSA 24.599(1) and MCL 550.503b; MSA 24.623(2).

the commissioner of insurance to the same extent that the constituent corporations were regulated prior to such merger * * *".[28] Blue Cross and Blue Shield merged pursuant to these sections to become BCBSM in January of 1975.

The Commissioner has no inherent regulatory authority over BCBSM. Whatever authority he does have comes solely from the Legislature. In this case this authority is embodied in the special enabling legislation enacted by the Legislature in 1939 and the subsequent amendments thereto. Several sections of that legislation will play important roles in our analysis of the issues presented.

MCL 550.302; MSA 24.592, as amended, refers generally to incorporation and touches the Commissioner's authority with regard to benefits:

"Any number of persons not less than 7 * * * may form a corporation * * * for the purpose of * * * operating a voluntary nonprofit medical care plan, whereby medical care is provided at the expense of the corporation to persons or groups of persons as shall become subscribers to the plan, *under contracts which will entitle each subscriber to definite medical and surgical care, appliances and supplies * * *. Such other benefits may be added from time to time as the corporation may determine, with the approval of the commissioner of insurance.*" (Emphasis added.)[29]

MCL 550.305; MSA 24.595 first sets forth certain requirements that the corporation must fulfill before beginning business:

"The persons so associating, before entering into any

---

[28] *Ibid.*

[29] MCL 550.501; MSA 24.621 is substantially similar to this statute except that it does not contain any language concerning the addition of further benefits with the approval of the Commissioner of Insurance.

contracts or securing any applications of subscribers, shall file in the office of the commissioner of insurance * * * *a statement showing in full detail the plan upon which it proposes to transact business, a copy of by-laws, a copy of contracts to be issued to subscribers, a copy of its prospectus, and proposed advertising to be used in the solicitation of contracts of subscribers."* (Emphasis added.)

This section then sets forth the powers of the Commissioner prior to permitting the corporation to begin business:

"The commissioner of insurance shall examine the statements and documents so presented to him * * *, *and shall have the power to conduct any investigation which he may deem necessary, and to hear such incorporators, and to examine under oath any persons interested or connected with the said proposed corporation.* If, in the opinion of the commissioner of insurance, the incorporation or solicitation of contracts would *work a fraud* upon the persons so solicited, *he shall have the authority to refuse to license the said corporation* * * *.*" (Emphasis added.)

In addition, this section outlines certain prerequisites that must be satisfied prior to issuing a license to the corporation and sets forth the Commissioner's authority over the contracts between the corporation and the subscriber:

"If, upon examination of the said articles of association, the documents and instruments above mentioned, and such further investigation as the commissioner of insurance shall make, *he is satisfied that (a) the solicitation of subscriptions would not work a fraud upon the persons so solicited; (b) the rates to be charged and the benefits to be provided are fair and reasonable; * * * and (e) adequate and reasonable reserves to insure the maturity of the contracts are provided,* he shall * * * deliver to such corporation a certificate of authority to

commence business and issue contracts entitling subscribers to definite medical and surgical care, *which contracts have been approved by him.*" (Emphasis added.)

Finally, this section sets forth the Commissioner's continuing authority to combat fraud:

"The said commissioner of insurance shall have power and authority, at any time to revoke, after reasonable notice and hearing, any certificate, order or consent made by him to the said corporation, to proscribe applications for membership, upon being satisfied that the further solicitation of subscribers will work a fraud upon the persons so solicited, and he shall have authority to make such investigation from time to time as he may deem best, and grant hearings to such incorporators in their relation thereto."[30]

MCL 550.311; MSA 24.601 sets forth the Commissioner's continuing authority with respect to the corporation's reserves:

"[The corporation] shall, before beginning business, and at all times thereafter while engaged in business, maintain reserves in such form and amount as the commissioner of insurance may determine."[31]

MCL 550.503; MSA 24.623 as originally enacted set forth the Commissioner's continuing rate approval authority as to hospitalization as follows:

"The rates charged to the subscribers for hospital service, and the rates of payment by such corporation

---

[30] MCL 550.506; MSA 24.626 is substantially similar to this statute except that it contains no language concerning the approval of the contracts between the corporation and the subscribers by the Commissioner prior to issuing a certificate of authority to do business.

[31] MCL 550.509; MSA 24.629 is identical to this statute.

to the contracting hospitals, shall at all times be subject to the approval of the commissioner of insurance."[32]

This section was later amended to state that "[t]he rates * * * *are* subject to the approval of the commissioner of insurance".

MCL 550.512; MSA 24.632 sets forth the Commissioner's continuing authority with respect to the corporation's acquisition and administrative expenses:

"All acquisition and administrative expenses in connection with such *hospital service plan* shall at all times be subject to the approval of the commissioner of insurance." (Emphasis added.)[33]

## V

Does the Commissioner have authority to determine whether the rates charged to the subscribers for hospital services are "fair and reasonable" and to disapprove rate increase requests which he finds are not, in order to keep the rates within the financial grasp of as many people as possible? This question encompasses what power, if any, the Commissioner has to examine the content of a rate request and disapprove it to the extent that wasteful expenditures are included in the rate base.

BCBSM argues that the Commissioner cannot require the corporation to implement specific hospital cost containment programs and that the Commissioner cannot disapprove a rate increase request on the ground that it includes waste. BCBSM contends that the Commissioner's continuing authority to approve the rates charged to

---

[32] There is no comparable provision in the Medical Care Corporation legislation, MCL 550.301 *et seq.;* MSA 24.591 *et seq.*

[33] There is no comparable provision in the Medical Care Corporation legislation, MCL 550.301 *et seq.;* MSA 24.591 *et seq.*

subscribers for hospital services and the rates of payment by BCBSM to hospitals means only that the Commissioner has the authority to prevent fraud or insolvency by determining actuarially whether the requested rate increase will generate sufficient revenues to pay for whatever expenses BCBSM has chosen to include in its rate base and to maintain the corporation's reserves at the level set by the Commissioner. If it will, BCBSM contends that the Commissioner must approve it in full. He may not examine the content of the rate request for waste.

The section of the enabling legislation which grants the Commissioner continuing rate approval authority, MCL 550.503; MSA 24.623, applies only to hospital services and does not state what standards are to guide the Commissioner in exercising that authority. It only provides that "[t]he rates charged to the subscribers for hospital service, and the rates of payment of the corporation to the contracting hospitals * * * are subject to the approval of the commissioner of insurance". However, the section which sets forth the Commissioner's authority prior to issuing a certificate of authority to do business, MCL 550.305; MSA 24.595, provides guidance as to the proper standard. That section states that prior to issuing the certificate, the Commissioner must be satisfied that "the rates to be charged * * * are *fair and reasonable*". (Emphasis added.) No other section of the enabling legislation speaks of a standard for exercise of the Commissioner's continuing rate approval authority. In addition, there is no indication in the legislation that some different standard is to guide the Commissioner after issuing the certificate of authority. It is logical to assume therefore that the Legislature intended the standard of "fair and

reasonable" rates to apply both before issuance of the certificate and upon the statutorily provided continuation of rate-setting authority.

The next question is whether rates which include waste are "fair and reasonable". We believe that they may not be. Rates unnecessarily inflated by waste retard rather than promote the availability of financial health care protection. We believe the Legislature did not intend that health care corporations, such as BCBSM, which were designed as a solution to the problem of inadequate health care, were to be free to engage in a course of action or inaction that would make them a contributing cause of the problem.

Three caveats to this conclusion are in order. First, the Commissioner cannot disapprove a rate increase request on the basis of expenditures which the corporation can affect only by invading the physician-patient relationship, usurping the physician's control over the practice of medicine, or by limiting the subscriber's free choice of hospitals and doctors. Numerous sections of the enabling legislation make it clear that any such action by the corporation is prohibited.[34]

Second, the Commissioner only has the authority to *consider* waste in determining if a rate increase is fair and reasonable. No section of the legislation indicates that the Commissioner has the additional authority to prescribe the specific remedy which the corporation must utilize to reduce or eliminate the waste. His only powers are to approve or disapprove rates in whole or in part. The management of the corporation has been specifically entrusted to the board of directors, not to the Commissioner.

---

[34] See MCL 550.310; MSA 24.600, MCL 550.501; MSA 24.621 and MCL 550.503; MSA 24.623.

Third, the Commissioner must exercise his authority reasonably and cannot issue orders and opinions which conflict with more specific grants of authority by the Legislature to other state agencies, such as the Department of Public Health. The Commissioner's actions are subject to judicial review and the record must support any findings of fact and conclusions of law.

## VI

Actions taken by the Commissioner with respect to physician screens during the 1975 rate review proceedings lead to the second major area of disputed authority.

The issue is whether the Commissioner has the authority to do indirectly what he cannot do directly—regulate increases in the rates of payment by BCBSM to physicians—by manipulating reserves.

MCL 550.311; MSA 24.601 grants the Commissioner continuing authority to determine the "form and amount" of reserves that BCBSM must maintain. The Commissioner contends that this authority empowers him to require BCBSM to submit all proposed increases in the physician screens to the Bureau of Insurance for approval since any increase in the screens could cause the level of the reserves to fall, provided he did not approve a corresponding increase in rates charged subscribers to cover the increased physician costs. The Commissioner also contends that his authority over reserves empowers him to disapprove proposed increases in the screens if he believes them to be unwarranted. The circuit court agreed with these contentions.

Although MCL 550.311; MSA 24.601 does not

explain the scope of the Commissioner's continuing authority to determine the "form and amount" of the corporation's reserves, the section relating to the Commissioner's precertification authority again provides guidance. MCL 550.305; MSA 24.595 states that prior to issuing a certificate of authority to do business to the corporation, the Commissioner must be satisfied that "adequate and reasonable reserves *to insure the maturity of the contracts are provided"*. (Emphasis added.) We are persuaded that the Legislature intended no more than to authorize the Commissioner to determine actuarially the level of reserves necessary to insure that the corporation could fulfill the commitments which it had made and set the reserves at that level. It is logical to assume, in the absence of any evidence to the contrary, that the Commissioner's continuing authority over reserves was meant to have the same scope as his authority over reserves prior to issuing the corporation a certificate of authority to do business. (See Part V regarding hospital rate approval.)

There is no indication in the legislation that the Commissioner was to have the authority to approve or disapprove increases in the physician screens indirectly via his authority over reserves. In fact, there are persuasive indications that the Commissioner was not to have such authority. In MCL 550.503; MSA 24.623, the Legislature specifically authorized the Commissioner to approve the rates of payment by the corporation to the hospitals that provide service to the corporation's subscribers. However, the Legislature did not enact a comparable provision authorizing the Commissioner to approve the rates of payment to physicians.

As noted earlier, the Commissioner's regulatory

authority comes solely from the Legislature. We are not at liberty to enlarge that authority or to permit the Commissioner to regulate indirectly matters which he cannot regulate directly.[35] There is an absence of any specific statutory authority to approve rates of payment to physicians, although there is a specific grant of authority to approve the rates of payment to hospitals. Also, the Commissioner's authority over reserves prior to issuing a certificate of authority to do business to the corporation is limited to determining actuarially that "adequate and reasonable reserves to insure the maturity of the contracts are provided". Continuing authority must be similarly limited in the absence of any other legislative direction. These combined considerations require the conclusion that the Legislature did not intend to grant the Commissioner the authority to approve or disapprove increases in the physician screens through manipulation of the reserves. The Commissioner's authority is limited to insuring that the corporation's reserves are set and maintained at a level sufficient to fulfill the corporation's commitments.

## VII

The third disputed area of authority concerns the Commissioner's powers with respect to the advertising practices of BCBSM.

During the 1975 rate review proceedings, the Commissioner examined the content of BCBSM's advertising and concluded that some of it was wasteful. As a result, BCBSM's revised rate in-

---

[35] See *Taylor v Michigan Public Utilities Commission,* 217 Mich 400; 186 NW 485 (1922), *G F Redmond & Co v Michigan Securities Commission,* 221 Mich 1; 192 NW 688 (1923), *Sparta Foundry Co v Michigan Public Utilities Commission,* 275 Mich 562; 267 NW 736 (1936), and 2 Cooper, State Administrative Law, pp 691-697.

crease request omitted a commensurate amount from its advertising budget.

MCL 550.512; MSA 24.632 does grant the Commissioner the continuing authority to approve "[a]ll acquisition and administrative expenses" of the corporation with respect to hospital services. There is no specific grant of continuing authority over advertising *per se.* The Commissioner contends that this authority and his general authority to approve the rates charged to the subscribers empower him to regulate the content of BCBSM's advertising through control of the pursestrings of BCBSM's advertising budget. The circuit court agreed with this contention but did not agree that the Commissioner also had the authority to require prior submission of BCBSM's advertising to the Commissioner.

Advertising expenses do fall within the context of "acquisition and administrative expenses" and necessarily play a part in the rates charged to subscribers by BCBSM. The Commissioner thus can properly consider the total dollar amount budgeted for hospital service advertising in determining whether to approve or disapprove a rate increase request. However, it does not follow that the Commissioner also has the authority to consider the substantive content of BCBSM's hospital service advertising. Indeed, such power could raise serious questions of freedom of speech and of prior restraint. The Legislature has provided for no control over advertising other than as it affects the rate base for hospital services.

## VIII

The final question we must resolve was generated by certain language employed by the circuit court in rendering its opinion. That court said that

the Commissioner had the authority to review the *"benefits"* offered by BCBSM to its subscribers to determine whether those benefits were *"fair and reasonable"*.[36] (Emphasis added.)

This language has given rise to uncertainty and apprehension regarding the status of negotiated benefits. BCBSM and some of the amici curiae who have filed briefs, including such diverse groups as the AFL-CIO, Bendix Corporation, the UAW, and Ford Motor Company, are concerned about the implications of the language emphasized above. Many benefits are hammered out in the course of negotiating collective bargaining agreements. It is feared that each time a rate increase request is made the Commissioner may now start examining the benefits an employer has agreed to provide its employees and vetoing any agreed benefits which the Commissioner feels are not "fair and reasonable".

Because the subject of benefits never was raised in the circuit court, it was error for the court, *sua sponte* and without background of record, to include reference to benefits in the final order. Therefore, we find that portion of the order to be void.

Reversed in part, affirmed in part. No costs, a public question.


Fitzgerald, Ryan, and Blair Moody, Jr., JJ., concurred with Coleman, J.


Williams, J. *(concurring in part, dissenting in part)*. This case relates to the on-going efforts of the state Legislature, the Commissioner of Insur-

---

[36] Appellant's appendix, pp 240a-241a.

ance, Blue Cross and Blue Shield of Michigan (BCBSM) and the general public to work out a mutually satisfactory system of health care within a Michigan context. The successful resolution of this problem is of the utmost importance not only to the health care profession, but to all the people of this state. Furthermore, since Michigan is a health care leader, this state's success or failure with a state health care system will impact upon other state and Federal programs.

## I. ISSUES

The central question of this case is whether BCBSM, in accepting public privileges such as tax exemption, immunity from suit, etc., also accepted public responsibility as well, and, if so, how much. BCBSM's position was epitomized by their negative answer in oral argument before this Court to the hypothetical question whether the public would have the right to review BCBSM's inclusion of a circus of white elephants in their rate base. In short, it is BCBSM's position that they are subject to only the most minimal supervision in the public interest.

This case's overriding question is developed by BCBSM challenging the power of the Commissioner of Insurance

1. To approve or disapprove rates charged to subscribers of BCBSM;

2. To approve or disapprove such rates under a "fair and reasonable" standard;

3. To review increases in physician screens;

4. To review BCBSM advertising as a part of the rate base;

5. To review previously granted health care benefits.

## II. PARTIAL CONCURRENCE AND DISSENT

The majority opinion has basically held that BCBSM does indeed have public responsibilities as well as privileges. Specifically with respect to the first two issues the majority opinion held that the Commissioner of Insurance has authority to review subscriber rates and may properly do so under a "fair and reasonable" standard. I concur. I also agree with two of the three reservations of "caveats" in regard to the Commissioner's authority over rates; namely the first, "the Commissioner cannot disapprove a rate increase request on the basis of expenditures which the corporation can affect only by invading the physician-patient relationship, usurping the physician's control over the practice of medicine, or by limiting the subscriber's free choice of hospitals and doctors" and the third, "the Commissioner must exercise his authority reasonably and cannot issue orders and opinions which conflict with more specific grants of authority by the Legislature to other state agencies, such as the Department of Public Health. The Commissioner's actions are subject to judicial review and the record must support any findings of fact and conclusions of law". While it seems to me that these must be taken for granted, I agree it is wise to emphasize the scope of the Commissioner's responsibility as well as that of BCBSM.

I dissent, however, to the second "caveat" of the majority opinion that

"the Commissioner only has the authority to *consider* waste in determining if a rate increase is fair and reasonable. No section of the legislation indicates that the Commissioner has the additional authority to prescribe the specific remedy which the corporation must utilize to reduce or eliminate the waste."

With respect to the third issue, it appears that the Legislature has not given the Commissioner of Insurance the power to approve or disapprove physician screens, so I concur that BCBSM may raise physician screens unless this action impermissibly reduces reserves. BCBSM with respect to physician screens appears to have the equivalent of a "lump sum" budget.

With respect to the fourth or advertising issue, I concur that advertising expenses are subject to approval as "acquisition and administrative expenses" and are a necessary part of the Commissioner's authority over rates. I dissent, however, from the majority opinion that the Commissioner does not have the power to examine the content of advertising and to exclude from the rate base advertising expenses not appropriate to the central purpose of BCBSM.

With respect to the fifth issue, I concur that the matter was improperly introduced by the circuit court and that what authority, if any, the Commissioner has over existing benefits is not a proper issue in this case, and the order with respect thereto is void.

### III. BACKGROUND

BCBSM operates under a favored status; it is a tax-exempt, non-profit corporation created by the Legislature and as such has attained a totally dominant market position. The findings of the Commissioner tend to indicate that BCBSM has accepted the benefits accorded by the Legislature, and at the same time, has abused its duties to the people of this state. "Along with this favored status must go a very large and very real public responsibility." (Opinion of the Insurance Commissioner, dated 5/8/75.)

During the rate review proceedings which preceded this litigation, great concern from the general public was expressed as to the impact of the policies of BCBSM. Further, small-business persons stated that, if the 33% overall rate increase requested by BCBSM were granted, such an increase could well be the deciding factor in their decision whether to remain in business (Opinion of Insurance Commissioner, *supra*).

This case, therefore, is one of great public as well as jurisprudential significance. We must deal with a program which has come full circle; the very entity established to assure the availability of medical care to persons in this state is engaged in a course of conduct which, if not checked, could result in a health care system so prohibitively expensive that medical care will be unavailable to those same people it was established to serve.

This background, as well as the legislative intent, must be recognized when examining the Commissioner's powers and duties in relation to BCBSM.

### IV. CONTINUING POWER OF THE COMMISSIONER OVER RATES

I concur in the conclusion of the majority that the Commissioner has the authority, under a standard of fairness and reasonableness, to approve rates. As noted in that opinion, this authority is supported both by the legislative intent and the statutory language.

As stated above, I further concur in two of the "caveats" of the majority:

"First, the Commissioner cannot disapprove a rate increase request on the basis of expenditures which the corporation can affect only by invading the physician-

patient relationship, usurping the physician's control
over the practice of medicine, or by limiting the sub-
scriber's free choice of hospitals and doctors."

and,

"Third, the Commissioner must exercise his authority
reasonably and cannot issue orders and opinions which
conflict with more specific grants of authority by the
Legislature to other state agencies, such as the Depart-
ment of Public Health. The Commissioner's actions are
subject to judicial review and the record must support
any findings of fact and conclusions of law."

I dissent from the second "caveat" of the major-
ity that

"the Commissioner only has the authority to *consider*
waste in determining if a rate is fair and reasonable No
section of the ·legislation indicates that the Commis-
sioner has the additional authority to prescribe the
specific remedy which the corporation must utilize to
reduce or eliminate the waste."

The majority finds such specific means to be
within the sole control of management while I find
that the same can properly come within the pur-
view of rate regulation.

The findings of the Commissioner pertinent to
this issue were that BCBSM had been dilatory in
responding to his July 30, 1970 order to recom-
mend means of effectively controlling the rising
costs of operating hospitals and although, on May
12, 1973, BCBSM finally did propose a pilot proj-
ect, that response was a modest one to an ex-
tremely important problem. The Commissioner in
short found the efforts of BCBSM in this regard to
be "halting and ineffective".

Further, the Commissioner found over-utiliza-

tion, defined as unnecessary health care, and over-bedding, defined as the maintenance by a hospital of more beds than necessary to serve patients' needs, which both resulted in additional waste.

The Commissioner, therefore, stated:

"* * * in future rate review hearings, the failure to develop and implement programs designed to effectively eliminate such wasteful expenses will result in those expenses being disallowed * * * " (Order of Insurance Commissioner, dated 4/29/74).

Such action is warranted by the Commissioner under the broad rate review authority. See MCL 550.503; MSA 24.623:

"The rates charged to the subscribers for hospital service, and the rates of payment of the corporation to the contracting hospitals, nursing facilities, and home health care agencies *are subject to the approval of the commissioner of insurance."* (Emphasis added.)

I base my opinion on this statutory authority. It is of interest, however, that this view of the Commissioner's power is also supported by rules recently approved by the Legislature's Joint Administrative Rules Committee. The majority opinion, at page 412, has chosen to disregard legislative pronouncements made subsequent to the date on which this case was argued before our Court. The majority may choose not to grant the usual deference accorded such pronouncements, *Boyer-Campbell Co v Fry,* 271 Mich 282; 260 NW 165 (1935), because the parties to this case have not had an opportunity to brief and argue the same. As noted, I reached my opinion independently of the legislative action. But this does not lessen the value of the rules as an expression by the enacting body of what was actually intended, and it does not reduce the guidance

the rules can provide to this Court.[1] And, of course, this Court can take judicial notice of such legislatively approved administrative rules.

The rules were filed with the Secretary of State December 30, 1977, and became effective 15 days thereafter. In pertinent part the rules state:

"R 550.10. Cost containment contract provisions.

"Rule 10. The contract shall include provisions which require that both the participating hospitals and the corporation engage in programs designed to limit, control, and contain increases in rates charged to subscribers by the corporation."

"R 550.15. Cost containment provisions required by the commissioner.

"Rule 15. (1) *The commissioner shall, whenever* he determines that it is *necessary* to do so in order to assure that rates to be charged to subscribers are fair and reasonable and that rates of payment to participating hospitals are not excessive, *require that a specific cost containment area be addressed and made part of the contract.*

"(2) The commissioner hereby requires that the contract include a provision that addresses itself to each of the 5 following cost containment areas: (a) number of hospital beds, (b) hospital utilization, (c) surgical screening, (d) laboratory and X-ray procedures, and (e) incorrect and false billing. With respect to each of these areas, the commissioner's intent is as follows:

"(a) Number of hospital beds: The number of hospital beds in Michigan shall be reduced to, and maintained at, the number necessary to minimize cost per bed and assure adequate bed availability.

"(b) Hospital utilization: The incidence and duration of hospitalization shall be limited to that which is medically necessary or appropriate."

---

[1] As stated, I view these rules as a valuable expression by the Legislature of its intent in regard to the specific language we are charged with interpreting. However, I agree with Justice COLEMAN that this case does not present a proper forum for examining the new Public Health Code signed into law on July 25, 1978.

"R 550.20. Specification and implementation of cost containment provisions.

"Rule 20. (1) The cost containment provisions required by rules 10 and 15 shall be specifically enunciated within the contract or shall be made part of the contract by specific reference.

"(2) A cost containment provision required by rule 10 or 15 shall specify the financial penalty or incentive designed to effectuate its objective.

"(3) Approval by the commissioner of the cost containment provisions required by rules 10 and 15 may be given conditional to the submission to him of periodic reports detailing the progress made in implementing the commissioner's intent. A failure to demonstrate satisfactory progress toward implementing the commissioner's intent shall constitute a presumption that (a) the rates charged to subscribers are not fair and reasonable and (b) the rates of payment to participating hospitals are excessive." (Emphasis added.) 1978 AACS R 550.1 *et seq.* (January, 1978).

Thus, the rules clearly set forth the legislative intent as to the power of the Commissioner to enforce cost containment, and reinforces my statutorily-based opinion that exclusion of wasteful expenses from the rate base is both a valid and enforceable exercise of the Commissioner's regulatory function.

## V. Power of Commissioner With Respect to Advertising Practices of BCBSM

As stated by the majority, "[d]uring the 1975 rate review proceedings, the Commissioner examined the content of BCBSM's advertising and concluded that some of it was wasteful", p 432. More specifically, the Commissioner determined that nearly 700 thousand dollars of it was wasteful. This figure represented the amount spent by BCBSM on "im-

age building" advertising. It was found wasteful because BCBSM could not show that it "could increase its efficiency and thereby decrease cost to its subscribers by either retaining or increasing its market penetration". (Opinion of Insurance Commissioner of 5/8/75.)

The majority opinion acknowledges that advertising does fall within "acquisition and administrative expenses", which are "at all times * * * subject to the approval of the commissioner of insurance", MCL 550.512; MSA 24.632. With that I concur, but I disagree and dissent from the idea that in carrying out this power of approval, the Commissioner has no authority to examine the content of the advertising.

The clear power of approval over advertising expenses is consistent with the Commissioner's power to determine that rates charged are "fair and reasonable", because the rates charged to subscribers are necessarily very much affected by acquisition and administration sums paid out by BCBSM, whether the sums go to purchase desks, pay employees or pay for advertising that provides no commensurate benefit to the subscribers. Such rates must initially be, and always remain fair and reasonable.

It is only through examination of the content of the advertising that determinations of reasonableness (or wastefulness) can realistically be made. The statute does not require that the Commissioner perform his duties in a vacuum.[2]

---

[2] This does not mean that the Commissioner has authority to require BCBSM to submit advertising to the Bureau of Insurance for prior approval and the Commissioner makes no contention in this Court that he has such authority. In appellee's brief, counsel for the Commissioner clearly states that the authority of the Commissioner does not include "* * * prior restraint on advertising material by requiring the Commissioner's approval of advertisement *before* publication" (Appellee's Brief, p 36) (emphasis added).

## VI. CONCLUSION

The Michigan Legislature enacted implementing legislation for BCBSM "to promote wider distribution of medical care"[3] for the people of Michigan and gave the Commissioner of Insurance broad powers of regulation to assure the meeting of that goal.

It rightfully did not leave BCBSM as the sole arbiter of whether it was performing its duties reasonably. The Commissioner, consistent with his power under the statute and duty to the people, and consistent with the right of BCBSM to manage its proper affairs under the statute, has determined that BCBSM is carrying forth its programs in a wasteful manner that may eventually increase expenses and therefore rates to the point where medical care is unavailable. I would affirm the holding of the circuit court to the extent discussed above, and find that the Commissioner has, in the main, acted properly and within his regulatory authority.

LEVIN, J. *(for reversal)*. Blue Cross and Blue Shield of Michigan (BCBSM) seeks a judgment declaring that the Commissioner of Insurance

—may not refuse to approve an increase in rates charged BCBSM subscribers for hospital services on account of its failure to implement "adequate" cost containment programs regarding excess beds and overutilization of health care services, or on account of "excessive" expenditures for advertising its programs and purposes, and

—may not disapprove an increase in the fees paid by BCBSM to physicians.

The circuit judge held that the commissioner

[3] See MCL 550.301; MSA 24.591.

has such powers.[1] We are convinced that he does not:

—The commissioner's power under the enabling acts to charter prepaid health care corporations after consideration of whether proposed rates and benefits are fair and reasonable does not imply a power to supervise rates and benefits after a corporation is chartered.

—The enabling acts do not otherwise imply that the commissioner's judgment of what is "fair and reasonable" is a basis for exercise of his powers to "approve" "rates charged subscribers for hospital services", "rates of payment to hospitals" and "acquisition and administrative expenses"; those powers do not authorize him to require changes in hospital practices, whether to improve quality or efficiency or to reduce cost, nor is he authorized to disallow expenditures for advertising the programs and purposes of BCBSM.

—The medical care enabling act confers no express authority on the commissioner over the fees paid by BCBSM to physicians and such authority cannot be inferred from his authority to determine the reserves BCBSM is required to maintain.

Although this action was commenced after disapprovals of requested rate increases and after a hearing officer heard evidence and the commissioner made findings, by agreement of the parties the propriety of his action in reducing the requested rate increases is no longer in issue. For that reason it was unnecessary for the circuit judge to determine whether there was factual justification for the disapprovals. The case is presented as fundamentally one of law and the sole relief sought is a declaratory judgment.

The only issue is whether the commissioner is

---

[1] We granted by-pass of the Court of Appeals.

empowered to disapprove rate increases on the grounds he advanced in entering the orders which precipitated this litigation. The Court holds that he is not, and we agree.

The word "waste" does not appear in the enabling acts. The Court's dictum that in setting rates the commissioner may "consider" whether there has been waste, that rates may be disapproved because of waste, is a perception unrelated to the facts of this or any other case. Without regard to whether one shares that perception, it is precipitous to begin the attempt to define the commissioner's powers in a factual vacuum.

Absent a rate disapproval predicated on identified "waste" and a supporting factual record, the Court's declaration that waste may be considered and, on that account, rates disapproved, circumscribed by stated limitations regarding physician and patient choice, under a standard of "fair and reasonable" without indication of whose judgment of what is fair and reasonable will govern, is so indefinite that there is a substantial risk that the Court's declaration may foster unrealizable expectations regarding the scope of the commissioner's powers. In the long run, that declaration may prove to be a disservice to those who might continue to look to the commissioner to develop accountability on the part of BCBSM. After the dust of further prolonged litigation settles, it may become clear that those who seek such accountability might better have looked elsewhere.

I

The commissioner contends that BCBSM is a "quasi-public institution with a duty to provide medical and hospital services as economically as feasible". He rests that characterization and duty

on "special privileges" which BCBSM has which insurance companies do not have.[2]

The commissioner claims that it is his responsibility to enforce the "duty" of BCBSM to provide health services "as economically as feasible", and "to assure efficient operation of Blue Cross-Blue Shield"; and that his authority extends to requiring BCBSM to develop and implement "cost containment procedures to correct overbedding and overutilization in order to avoid unfair and unreasonable rates". He rests these claims on the enabling acts:

i) The "rates charged to the subscriber for hospital services, and the rates of payment" by BCBSM to the hospitals are "subject to the approval of the commissioner of insurance";[3]

ii) Reserves are required to be maintained by BCBSM "in such form and amount as the commissioner of insurance may determine".[4]

---

[2] He stresses that:

i) under the enabling acts BCBSM is "a charitable and benevolent institution, and its funds and property [are] exempt from taxation" MCL 550.515, 550.315; MSA 24.635, 24.605;

ii) it receives a "preferred rate" from participating hospitals; "in all but a few cases it pays substantially less" for hospitalization than is paid by a health insurance company;

iii) it is not required to meet the capital and surplus requirements for an insurance company, MCL 550.506, 550.305; MSA 24.626, 24.595; "it is doubtful that Blue Cross-Blue Shield would have been incorporated but for this privilege";

iv) "Blue Cross-Blue Shield of Michigan is virtually the entire health insurance industry of Michigan. Its monopoly is so pervasive that hospitals must participate with Blue Cross-Blue Shield or struggle to survive."

[3] MCL 550.503; MSA 24.623.

The enabling acts state that BCBSM "shall be subject to regulation and supervision by the commissioner of insurance as hereinafter provided". MCL 550.501, 550.302; MSA 24.621, 24.592.

[4] MCL 550.509, 550.311; MSA 24.629, 24.601.

He also relies on enabling act provisions

i) empowering him to issue a certificate of authority authorizing the organization of health care corporations and to revoke such a certificate, MCL 550.506, 550.305; MSA 24.626, 24.595;

ii) conferring on him the power of visitation and examination into

He also claims that he has the power to "determine the maximum dollar amount that may be expended for advertising purposes" and when a rate increase is requested to disallow the amount spent for "wasteful" advertising. He relies on his claim that he has authority to disapprove unfair and unreasonable rates and on the hospital enabling act: "[a]ll acquisition and administrative expenses in connection with such hospital service plan shall at all times be subject to the approval of the commissioner of insurance".[5]

He further claims that he has the power to disapprove an increase in the fees BCBSM pays doctors, relying on the enabling act provision empowering him to determine the form and amount of BCBSM reserves.[6]

Because BCBSM is a unique institution enjoying tax-free status, because it may receive preferred rates from participating hospitals, because it is exempt from the capital and surplus requirements of an insurance company, and especially because in many parts of the state it practically dominates and functionally monopolizes the field of prepaid health care, the commissioner's argument that there is a real and urgent need for responsible and effective governmental control of BCBSM is strong and appealing. We cannot agree with his contention, however, that on account of such real and urgent need the enabling acts may be read to provide it.

The commissioner asserts a power to control or

---

the affairs of such a corporation, MCL 550.507, 550.306; MSA 24.627, 24.596; and

iii) requiring the filing of annual reports in such form and containing such matters as he "shall prescribe", MCL 550.508, 550.307; MSA 24.628, 24.597.

[5] MCL 550.512; MSA 24.632.

[6] MCL 550.311; MSA 24.601.

supervise the health care system, through BCBSM, to promote efficiency and reduce costs. The question whether such power should be conferred on any public official and, if so, on whom and how, is still a lively issue awaiting legislative resolution. The structure and history of the enabling acts persuade us that such power was not conferred on the commissioner in 1939, almost 40 years ago.

## II

The commissioner's argument that BCBSM is a quasi-public institution[7] rests on law and fact: the enabling acts and the remarkable growth of BCBSM since it was chartered and its importance in health care.

The reduced capital and surplus requirements, the designation as charitable and benevolent, exemption from taxation, rights of visitation and requirement of annual reports, do not suggest a correlative duty of economical and efficient operation, or a role for the commissioner in that regard. Adoption of the commissioner's arguments might mean that charitable and benevolent or other institutions which have advantages conferred by government might generally be subject to administrative supervision by government regarding their efficiency and, hence, regarding their methods of operation or production or distribution. While the Attorney General has some authority to prevent misuse of such preferred status, it is quite another

---

[7] It has been suggested that the 19th century corporate legal framework may be inadequate today. Gibbons, *Governance of Industrial Corporations in an Industrial Democracy,* 31 Bus Lawyer 1393 (1976). In electing "public directors", BCBSM has begun to move toward acceptance of public responsibility. See Blumberg, *The Role of the Corporation in Society Today, id.,* p 1403. But see DeMott, *Reweaving the Corporate Veil: Management Structure and the Control of Corporate Information,* 41 L & Contemporary Problems 182 (No. 3, 1977).

matter to infer a power on the part of a governmental official to address inefficiencies in the private sector.

The argument that BCBSM receives a preferred rate from participating hospitals may cut both ways and mean that subscribers are paying less than others are paying and that those insured by health insurance companies are subsidizing BCBSM subscribers.

While BCBSM has a dominant role in health care in Michigan, there are alternative health care providers and mechanisms for pre-funding personal and family health care. Nonparticipating hospitals can and do function, albeit with difficulty, and a large number of doctors are not participants. Policies of health insurance, not BCBSM, cover the cost of providing health care to a substantial portion of the population; in some parts of the state BCBSM is not dominant.

To be sure, the policies of BCBSM have a significant influence on the availability, quality and cost of health care. It may well be that BCBSM either already has achieved or soon will achieve so dominant a position that the courts should recognize, by extending to BCBSM principles and concepts developed at the common law, that it has legally enforceable duties to those affected by its policies not stated in the enabling acts or in its contracts.[8]

Such common-law duties would be enforceable in a court of law, not administratively.[9] Assuming

---

[8] See, e.g., Allen v Michigan Bell Telephone Co, 18 Mich App 632; 171 NW2d 689 (1969) (unconscionable terms of a contract); 13 Am Jur 2d, Carriers, § 175, p 702; 40 Am Jur 2d, Hotels, Motels and Restaurants, § 62, p 942 (common-law duty of carriers and innkeepers to carry and receive the public).

[9] See Taylor v Michigan Public Utilities Commission, 217 Mich 400, 402; 186 NW 485 (1922):

"The Michigan public utilities commission is a creature of the statute, has no inherent or common-law power, and its jurisdiction in

that the commissioner would have the right to
maintain an action to enforce compliance with
such common-law duties, the enabling acts do not
confer upon him the power to enforce administra-
tively duties owing to providers or users that may
be recognized by the common law.

Accordingly, even if the courts were to declare
that BCBSM has a common-law duty to act in the
public interest and that an aspect of that duty is
to require participating health care providers to
contain costs and to be cost effective and efficient,
avoiding "waste", the commissioner could not en-
force such a duty by administrative directive, even
if he provided an opportunity for a full hearing
and other procedural protections beforehand.

## III

The medical care enabling act does not, in con-
trast with the hospital care enabling act, expressly
empower the commissioner to approve rates
charged subscribers or rates of payment to health
care providers.

The argument for control of rates charged sub-
scribers and physicians' fees based on the commis-
sioner's power to determine the level of reserves is
not persuasive.

The power to establish the amount of money
required to conduct a business does not imply a
power to direct how the money shall be used. The
purpose of reserves is to assure liquidity and sol-
vency. It distorts that purpose to employ that
power as the mechanism for control or supervision
of programs or operations or to achieve some

any instance must affirmatively appear in the statute before it can be
invoked or exercised."

purpose, however meritorious, unrelated to the need to maintain adequate funds to assure that BCBSM can discharge obligations incurred to subscribers and health care providers.

## IV

The commissioner's claims, based on the language of the enabling acts, that to achieve fair and reasonable rates he can require a reduction in rates charged subscribers and cost containment programs and disallow advertising expenditures, are also unpersuasive.

The commissioner must, under the enabling acts, consider the fairness and reasonableness of rates and benefits in deciding whether chartering a proposed health care corporation would work a fraud on the public. He should possibly consider the same criteria in deciding whether fraud is being practiced by a chartered corporation requiring revocation of its charter. He does not, however, have continuing authority under the chartering provisions to decide whether rates and benefits are fair and reasonable and to require adjustments to achieve fairness and reasonableness.[10] The charter-

[10] "The persons so associating, before entering into any contracts or securing any applications of members, shall file in the office of the commissioner of insurance, together with triplicate copies of the said articles of association with the certificate of the attorney general annexed thereto, a statement showing in full detail the plan upon which it proposes to transact business, a copy of all proposed contracts between the corporation and participating hospitals, a copy of by-laws, a copy of contracts to be issued to subscribers, a copy of its prospectus, and proposed advertising to be used in the solicitation of contracts of members. The commissioner of insurance shall examine the statements and documents so presented to him by the persons so associating, and shall have the power to conduct any investigation which he may deem necessary, and to hear such incorporators, and to examine under oath any persons interested or connected with the said proposed corporation. If, in the opinion of the said commissioner of insurance, the incorporation or solicitation of contracts for service would work a fraud upon the persons so solicited, he shall have

ing provisions do not empower the commissioner to employ any remedy against a chartered health care corporation other than to revoke its charter upon a finding of fraud.[11]

---

authority to refuse to license the said corporation to proceed in the organization and promotion of the association. If, upon examination of the said articles of association, the documents and instruments above mentioned, and such further investigation as the said commissioner of insurance shall make, he is satisfied that (a) the subscriptions to membership or for hospital service contracts would not work a fraud upon the persons so solicited to become purchasers of hospital service contracts; (b) the rates to be charged and the benefits to be provided are fair and reasonable; (c) the amount of money actually available for working capital is sufficient to carry all acquisition costs and operating expenses for a reasonable period of time from the date of the issuance of the certificate of authority, and is not less than the sum of $10,000.00; (d) the amounts contributed as the working capital of the corporation are repayable only out of earned surplus; and (e) adequate and reasonable reserves to insure the maturity of the contracts are provided, he shall return to such incorporators 1 copy of such articles of association certified for filing with the county clerk of the county in which said corporation proposes to maintain its principal business office, and 1 copy to be certified by the commissioner of insurance for the records of the corporation itself, and shall retain 1 copy for his office files, and he shall then issue a certificate authorizing said incorporators to proceed with the organization.

"The commissioner of insurance shall have power and authority, at any time, to revoke any certificate, order or consent made by him to the said corporation, to proscribe applications for membership, upon being satisfied that the further solicitation of members will work a fraud upon the persons so solicited, and he shall have authority to make such investigation from time to time as he may deem best, and grant hearings to such incorporators in their relation thereto." MCL 550.506; MSA 24.626.

The medical care corporations enabling act includes a provision, MCL 550.305; MSA 24.595, identical in all substantive respects.

[11] It is contended that because a "fair and reasonable" standard is stated in the chartering provisions in regard to the rates and benefits of a proposed health care corporation that a like standard should be read into rate approval. One can with at least as much, perhaps greater, force contend that the inference to be drawn from the expression of that standard for charter approval and the failure to express such a standard for rate approval is that such a standard was not intended to be applied in rate approval.

If one concludes that such a standard should be inferred from the chartering provision, the meaning of that standard as used in that context must be transferred with it. In context, it appears that "fair and reasonable" like the other four criteria there stated (see fn 10, *supra*), relates to the *bona fides* and solvency of health care corporations.

Assuming that one were to read into the rate approval provisions of the hospital care enabling act a "fair and reasonable" standard for the exercise of the commissioner's power to approve rates and acquisition and administrative expenses, it does not follow that the commissioner's judgment of what is fair and reasonable governs.

If the commissioner's judgment were to govern, it would mean, having in mind the limited judicial review of administrative determinations supported by substantial record evidence, that he might substitute a low "fair and reasonable" standard of health care in the name of economy and efficiency. That would not be consonant with the structure and history of the enabling acts.

## V

BCBSM was organized on the initiative of hospitals and doctors to provide a means of funding hospital and medical care; the concept was that BCBSM would act as the agent for health care providers in generating funds from subscribers and distributing the funds to providers, chosen by subscribers, who furnish health care services.[12]

BCBSM may not deny a subscriber the choice of hospital. The sentence of the hospital enabling act principally relied on by the commissioner—"[t]he rates charged to the subscribers for hospital service, and the rates of payment of the corporation to the contracting hospitals" are subject to the commissioner's approval—is immediately preceded by a sentence stating that BCBSM "shall not deny

---

[12] See Burns, *The Michigan Enabling Act for Non-Profit Medical Care Plans,* 6 Law and Contemporary Problems 559 (1939).

Articles of incorporation of BCBSM state that its purpose is "to act as agent" for health care providers in carrying out the prepaid health care plan subject to the provisions of the enabling acts.

the subscribers the right to select any hospital" licensed by the state department of health which meets the standards set by BCBSM for all contracting hospitals, and that contracts issued by BCBSM to subscribers "shall constitute direct obligations of the hospital or hospitals" with which BCBSM has contracted for hospital services.[13]

A subscriber has a similar right of choice of doctor. Every doctor has the right to register with BCBSM for general or special medical care. BCBSM "shall not impose restrictions on the doctors" "who treat its subscribers as to methods of diagnosis or treatment. The private physician-patient relationship shall be maintained and the subscriber shall at all times have free choice of doctor".[14] Medical care furnished subscribers "shall be in accordance with the accepted medical practice in the community at all times".[15]

The enabling acts were intended to resolve legal challenges that prepaid health care corporations engage in the illegal practice of medicine and are subject to regulation as insurance companies.[16] To address the concern that the public might be bilked by fly-by-night health care corporations,[17]

---

[13] MCL 550.503; MSA 24.623.

[14] MCL 550.310; MSA 24.600.

Although no comparable provision appears in the hospital care enabling act, it undoubtedly was expected that doctors covered by the medical care enabling act would practice in hospitals covered by the hospital care enabling act.

[15] MCL 550.312; MSA 24.602.

Subscribers are entitled to receive the agreed-upon hospital and medical services from participating doctors and hospitals without further charge. MCL 550.501, 550.302; MSA 24.621, 24.592.

[16] Anno: *Group Medical and Hospital Service Plans,* 167 ALR 322. These concerns were addressed in MCL 550.302, 550.312, and 550.501; MSA 24.592, 24.602, and 24.621.

[17] "The field is certainly not one which should be left entirely unregulated; the very attractiveness of the plans offers peculiar opportunities for unscrupulous commercial activity." Note, *The Legal Problems of Group Health,* 52 Harv L Rev 809, 816 (1939). See, also,

powers were conferred on the commissioner to protect against fraud[18] and to preserve solvency.[19]

Hospitals were left to decide, by their boards of trustees and administrators, the facilities and services to be provided; doctors to decide the hospitals with which to affiliate; patients to choose a doctor and, within the limitations of the doctor's affiliations, a hospital.[20]

BCBSM is a voluntary association of health care providers and users who may develop such health care programs as they can agree upon within the framework of the enabling acts. Hospitals and doctors, together with BCBSM, decide the level, quality and efficiency of health care, including bedding and utilization practices.

## VI

### The commissioner's power to approve rates and

Note, *Group Health Plans: Some Legal and Economic Aspects,* 53 Yale L J 162, 166 (1943).

"The essential consideration is the importance of the undertaking from the point of view of the public and likelihood that the organization promising to make provision for medical services will be able to perform the agreement." Burns, *The Michigan Enabling Act for Non-Profit Medical Care Plans,* 6 Law and Contemporary Problems 559, 561-562 (1939).

"The statute vests in the Commissioner of Insurance broad powers of supervision, examination and investigation, as well as suspension and revocation of the certificate of authority *for violation of the provisions of the act designed to protect the subscribers against fraud.*" Panchuk, *Hospital and Medical Service Plans,* 19 Mich St B J 570 (1940) (emphasis supplied).

[18] MCL 550.506, 550.305; MSA 24.626, 24.595.

[19] MCL 550.509, 550.311; MSA 24.629, 24.601.

[20] A subscriber may thus choose a participating doctor on the staff of a hospital with a shortage of beds who orders greater use of hospital facilities than a doctor on the staff of a hospital with excess facilities.

The subscriber's freedom of choice is not, however, necessarily a cause of inefficiency and waste. Prepaid health care reduces the consumer's incentive to choose the most efficient provider, and cost-plus reimbursement of hospitals and fee for service compensation of physicians reduce provider incentive to be efficient.

acquisition and administrative expenses was conferred in the context of a health care system designed and administered by the private sector. Health care providers (hospitals and doctors), guided by consumer needs, preferences and resources, had theretofore developed a health care delivery system. BCBSM was and is primarily a mechanism for generating the funds to support that system; in return for their contributions to the support of that system, subscribers are entitled to medical care provided by that system. In enacting enabling acts authorizing prepaid health care corporations, there was no purpose to authorize the commissioner to alter the design of or assume a role in the administration of that system.

"The concept of the Commissioner's role in the regulatory process is governed by statutory enactments, as interpreted by this Court. He asserts that his 'duty and responsibility' is the 'needs and hopes of the subscribers of Vermont to obtain a dollar's worth of health and physician services in these difficult times.' The objective is indeed praiseworthy, but it does not follow that the Legislature has, to attain it, entrusted to the Commissioner the prerogatives of management." *New Hampshire-Vermont Hospitalization Service v Commissioner, Department of Banking & Insurance,* 133 Vt 333, 336-337; 339 A2d 453 (1975).

The commissioner's power to approve rates and acquisition and administrative expenses was not granted to enable him to influence or improve the design of that system, but, rather, to assure that adequate but not excessive funds were generated to discharge obligations incurred to subscribers and hospitals and that rates of payment to hospitals and expenditures by BCBSM for acquisition

and administrative expenses were devoted to health care purposes.[21]

The commissioner has identified the broad outlines of the cost containment problem resulting from bedding, utilization and other practices of health care providers. He has directed BCBSM to do more than has been done. BCBSM is directed to identify the specifics of the problem, devise a program to ameliorate it, choose the providers who shall bear the brunt of that program, and implement it.

Implicit in the commissioner's directives is the concept that BCBSM should use its institutional and fiscal power to revise the health care system to achieve greater cost containment without regard to whether the providers agree to the revisions. When organized BCBSM did not have and was not seen as having that institutional and fiscal power. It was visualized as a fiscal agent, the servant, not the master, of the health care providers; it was not expected to decide the level of health care in Michigan. Even today it is not the fiscal agent for all health care in Michigan.

The commissioner's asserted powers embrace only this one, albeit the dominant one, of a number of health care funding sources. It would be adventitious to conclude that because BCBSM proved to be the most successful of the health care pre-funding mechanisms and is comprised of health care providers that the commissioner through his rate approval authority over BCBSM thereby became empowered to revise the health care system of this state. The enabling acts, the

---

[21] It appears that although for many years rates have been submitted to the commissioner for approval, until recent years he took a passive view of his rate approval function. That practical administrative construction of the enabling act reinforces us in our view of the scope of the commissioner's power.

source of the commissioner's authority, do not address the consequences of a health care corporation achieving dominance of the health care system, a development not in legislative contemplation when they were enacted.

The commissioner reasons essentially that the problem of the cost of health care has become so acute that the fundamental premises on which BCBSM was organized and his powers of approval were conferred should be creatively construed in the public interest. In a word, the end justifies the means: He will exercise the power of the purse through rate disapproval; BCBSM will exercise the power of the purse through cost containment directives; the resulting limitations on the free exercise of the judgment of the managers of hospitals, of physicians, of subscribers and of BCBSM are in their interest.

Just as the commissioner could not increase rates charged subscribers to enable health care providers to furnish a service they do not wish to, neither can he reduce rates to eliminate a service he believes need not or should not be provided. A reduction in bedding or utilization may adversely affect the quality of health care; the power to make such decisions is not to be lightly inferred from authority over financial matters.

Commissioner directives premised on BCBSM imposing on providers and users program levels which they would not freely agree to in their mutual self-interest, unconstrained by the power of government, ignore the voluntary nature of the association and compact, and are inconsistent with the structure and history of the enabling acts.

A fundamental premise of the BCBSM concept was that the cost of providing health care to a subscriber would be prepaid in full by rates

charged subscribers. To the extent that implementation of the commissioner's directives results in transferring costs other than to subscribers, that concept will be eroded.[22]

If the commissioner's power to approve rates implies the power to alter the level of hospital services, because otherwise rates have or will become "unreasonably" high, by the same process of reasoning he has the power to order changes in the practices of automobile mechanics and fire repair contractors to improve their efficiency and reduce automobile and fire insurance premiums.

The terms "overbedding", "overutilization" and "waste" are value laden and state a conclusion regarding the level of service. The question whether beds should be eliminated and utilization improved is a judgment which, like other judgments relating to the quality, level and means of providing health care services, has generally been confided to the private sector.

We conclude that the commissioner does not have statutory authority to require changes in the agreed-upon programs, whether to improve quality or efficiency or to reduce cost. He may not inhibit by rate disapproval the provision of facilities and services which, in the judgment of informed and qualified health care professionals, are necessary and warranted.[23] Similarly, expenditures for adver-

---

[22] The commissioner's directives are based on assumptions regarding the ability of BCBSM to impose its will on health care providers and subscribers which may be unrealistic. Health care providers might submit to such directives whether thought to be justified or not. On the other hand, some providers might disassociate altogether from BCBSM or become nonparticipating. Providers generally will seek other ways and means of passing on the costs of health care not met by BCBSM that they deem justified and which the market can absorb to subscribers, nonsubscriber users, health insurance companies, philanthropic organizations and government.

[23] Facilities and services so considered necessary and warranted would be within the spectrum of fair and reasonable, assuming such a standard.

tising related to the business and purposes of BCBSM cannot be disallowed; the judgment of its managers regarding the nature and extent of such expenditures, if related to its business and purposes, is not subject to review by the commissioner.

In sum, the scope of the authority delegated to the commissioner by the Legislature does not include overseeing the efficiency of the health care system and cost containment. He may not disapprove rates charged subscribers or rates of payment to hospitals because of failure by BCBSM to develop and implement cost containment programs or because of advertising expenditures related to the business and purposes of BCBSM, nor may he disallow an increase in physicians' fees.

## VII

We are not unmoved by the commissioner's concern that the cost of health care is rising faster than the ability of many citizens to pay for it and, hence, may become unavailable to them.

The commissioner's concern is widely shared. Health care providers as well as consumers are troubled by the increasing share of the gross national product being devoted to health care.

Health care providers through their institutions —the hospital and medical associations and, indeed, BCBSM itself—have promulgated guidelines and restrictions on bedding and utilization to improve the quality and efficiency and reduce the cost of the health care system and preserve control of the system by the private sector with minimal governmental intervention. Those guidelines and restrictions, while limiting both the patient's and the doctor's freedom of choice and judgment, are

not governmental decisions; it is quite another matter to involve government in such decisions. To do so would be a fundamental departure from the means by which accommodations of conflicting values and interests have in the past generally been achieved. Except in time of war or other emergency or, possibly, in the case of public utilities, and then only under the most explicit enabling legislation, the private sector has not been cost regulated.

To be sure, the nature of the infrastructure of BCBSM, composed as it is largely of health care providers, contains few restraints on the escalation of facilities, services and costs. While some large users and the providers' organizations have a substantial influence on its policies, BCBSM is an institution of enormous power relatively immune from market or other controls. While it does not control the price of health care services, because BCBSM is comprised of health care providers and because it dominates health care in Michigan, its policies regarding payments to physicians and hospitals tend to establish, in many parts of the state, the range of prices for the health care industry. There are no adequate safeguards to protect subscribers, whether individuals or in groups, and little accountability to them or the public.

A number of proposals have been advanced for governmental intervention. Some would control, others would regulate in varying degrees, the health care industry.

The question whether and to what extent government should supervise or control BCBSM, health insurance companies and the health care industry is a matter of national and statewide debate. There are many who feel that health care providers and BCBSM have acted irresponsibly.

Others maintain that the most costly solution would be to involve governmental bureaucracies in this highly complex technological, economic, sociological and political problem implicating the competing claims of new and old, urban, suburban and rural hospitals and the jobs of organized and unorganized professional, skilled and unskilled workers.[24]

Whatever the outcome of that debate, it is clear that the basic issues of public policy, still unresolved, were not decided in 1939, almost 40 years ago, in favor of governmental control or supervision. A court may pour only so much meaning into a statutory vessel.

The Congress and the Legislature have, in recent years, shown an awareness of the health care cost problem.[25] In 1972 the Federal government, through its Medicare and Medicaid programs, required that cost containment steps be taken.[26] Also in 1972 the Legislature authorized the Director of the Department of Public Health to withhold permission to build, enlarge or modernize hospitals.[27] In July, 1978, as part of a comprehensive Public

[24] See Havighurst, *Health Care Cost-Containment Regulation: Prospects and an Alternative,* 3 Amer J L & Medicine 309 (1977); Weiner, *Governmental Regulation of Health Care: A Response to Some Criticisms Voiced by Proponents of a "Free Market",* 4 Am J L & Medicine 15 (1978); Mechanic, *Rationing Medical Care,* 11 The Center Magazine 22 (1978).

[25] See National Health Planning and Resources Development Act of 1974, PL 93-641; 42 USC 300k; 1978 PA 323; MCL 325.2001 *et seq.;* MSA 14.526(51) *et seq.*

[26] 42 USC 1320a-1 provides for denial of Medicare and Medicaid reimbursement for capital costs (interest and depreciation) for any capital expenditures in excess of $100,000 without the approval of a designated planning agency.

42 USC 1320c *et seq.* establishes professional standards review organizations to monitor the appropriateness of hospital admissions and the length of stay of inpatients.

[27] MCL 331.451 *et seq.;* MSA 14.1179(51) *et seq.*

See Symposium: *Certificate-of-Need Laws in Health Planning,* 1978 Utah L Rev 1.

Health Code, he was directed to develop a program to reduce beds which may also have the effect of improving utilization.[28] The powers so conferred on the Director of the Department of Public Health parallel those claimed four years ago by the Commissioner of Insurance through the actions which prompted this lawsuit.[29]

The Public Health Code places primary responsibility for the development and regulation of health care facilities upon the state Department of Public Health.[30] It is that department, not the Commissioner of Insurance, which is charged with the duty to establish "a comprehensive system of licensure and certification" for "health agencies" and to "coordinate all functions in state government affecting health facilities and agencies".[31]

The limited cost containment authority conferred on the Director of the Department of Public Health is circumscribed by a drawn-out timetable and by providing a substantial voice for health care providers in the decisional process.[32] Those

[28] 1978 PA 368, § 22154.

[29] The commissioner reasserted these powers, with the imprimatur of a committee of the Legislature, in promulgating cost containment regulations. 1978 AACS R 550.1 et seq. (January, 1978).

[30] 1978 PA 368, § 2221. But see § 21025 granting to the department and the Insurance Bureau coequal responsibility with regard to Health Maintenance Organizations.

Section 22131(2) addresses the issue of overutilization and requires a finding that existing inpatient facilities and services are efficient and appropriate before a certificate of need is granted. The department is authorized, under § 20171, to promulgate and enforce rules regarding the organization and function of health facilities, including rules relating to utilization and quality control review.

[31] 1978 PA 368, § 20131.

[32] Id., § 22154.

Section 22111 provides for certificates of need for new health facilities. Section 22121 provides (i) that the certificate of need board (CON) shall include physicians and consumers appointed by the Governor, (ii) for biannual review of the CON program by the State Health Coordinating Council, and (iii) appellate procedures.

Section 22131 states 14 criteria to be considered in acting on a

limitations suggest that even at this late date the Legislature is not prepared to confer on a single state officer the power to take immediate steps to control or supervise health care with a view to cost containment.

It may be that a more effective job could be done by BCBSM and that the commissioner, acting alone on his own information, unburdened by the delays and constraints of the health code, with the full support of this Court, could be effective in bringing about a meaningful reduction in costs. Those are judgments, however, which in this still developing statutory context are peculiarly within the province of the Legislature.

The commissioner misconceives his function when he concerns himself with cost containment. He is not authorized to substitute his judgment for that of health care providers and BCBSM regarding the design of the health care system. He is not at liberty to alter it, to improve its quality or efficiency or to reduce its cost. His area of concern is that it remain solvent and that expenditures charged to subscribers are for the purposes for which BCBSM was organized.

We would reverse the circuit court and enter a judgment declaring that the commissioner was without power to disapprove rate increases on the grounds advanced. No costs, a public question.

KAVANAGH, C.J., concurred with LEVIN, J.

---

request for a certificate of need. It also requires six separate findings before a certificate of need can be granted.

In preparing a plan addressing excess hospital beds, the Department of Public Health, under § 22154, must establish guidelines and consider five other factors in addition to the criteria noted above. Approval of such a plan by the State Health Coordinating Council is required under § 22154(9).